# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **In re:** | : | **CIVIL ACTION NO. 1:18-CV-683** |
| | : | |
| **MANN REALTY ASSOCIATES, INC.,** | : | **(Chief Judge Conner)** |
| | : | |
| **Debtor** | : | |
| | : | |
| **ROBERT M. MUMMA, II,** | : | |
| | : | |
| **Appellant** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ANDREW R. VARA,** | : | |
| **Acting United States Trustee,** | : | |
| | : | |
| **Appellee** | : | |

## MEMORANDUM

Appellant Robert M. Mumma, II ("Mumma"), on behalf of Mann Realty Associates ("Mann Realty" or "debtor"), filed a voluntary petition for Chapter 11 bankruptcy. The United States Trustee ("Trustee") filed a motion for conversion or dismissal under 11 U.S.C. § 1112, and a hearing took place on January 25, 2018. During the hearing, the Bankruptcy Court limited Mann Realty's testimony and converted the case to Chapter 7 rather than appoint a Chapter 11 trustee. Mumma appeals the Bankruptcy Court's decision.

## I.     Factual Background & Procedural History[1]

### A.     Background

Mumma is Mann Realty's president and a 37.5% shareholder in the company. (Doc. 26-2 at A357).  Mann Realty owns 12 pieces of property—mainly commercial real estate and one quarry.  (Id. at A362-64).  The most valuable and most important property here is the quarry, known as Fiddler's Elbow, which Mann Realty valued at $12 million.  (Id. at A303, A407).

As part of its Chapter 11 duties, Mann Realty submitted disclosure statements and a reorganization plan.  (Id. at A245-432).  These filings documented Mann Realty's intention to sell some of its properties, to continue to generate income on others, and to use the proceeds to pay its creditors.  (See, e.g., id. at A314-45).  Both disclosure statements, however, noted that "[c]urrently, the quarry cannot be mined due to its flooding."  (Id. at A257, A358).  The statements also flagged Mann Realty's struggles to generate cashflow: "With several vacancies in its commercial properties and the inability to generate significant revenue from the limestone quarry, Debtor was unable to maintain adequate cash flow to address its mortgage obligations and real estate taxes."  (Id.)  The disclosure statement also explained that Mann Realty planned to "commence litigation" against the quarry's holdover tenant, Pennsy Supply, Inc., to compel payment of overdue rent and to drain the quarry so it can be mined.  (Id. at A362).

---

[1] Appellants from the Bankruptcy Court must submit an appendix under Federal Rule of Bankruptcy Procedure 8018(b)(1).  We cite the appendix (Docs. 26-1, 26-2) as "Doc. __-_ at A[page(s) of Appendix]," and to the conversion hearing transcript, which appears within the appendix, (A433-506), as "Hr'g Tr. __:__."

Mann Realty also submitted monthly operating reports for April through December 2017. (See Doc. 26-1 at A97-222; Doc. 26-2 at 223-33). Together, these reports showed net operating losses. (Id.) Mann Realty amended its November 2017 report to lower its net operating loss by over $125,000, but still reported a net loss. (Hr'g Tr. 54:10-22).

The Trustee moved for conversion or dismissal under 11 U.S.C. § 1112. (Doc. 26-2 at A234–41). The Trustee argued in its motion that Mann Realty had suffered "substantial or continuing loss to or diminution of the bankruptcy estate" and had "fail[ed] to timely provide information reasonably requested." (Id. at A237).

## B.    Conversion Hearing

Chief Bankruptcy Judge Robert N. Opel, II, held the conversion hearing on January 25, 2018. (Id. at A433). Mumma, the Trustee, and representatives from four creditors (S&T Bank, Santander Bank, Double M Real Estate LLC, and McCormick 108, LLC) attended the hearing. (Id. at A433-34). Each creditor has outstanding debts owed to them by Mann Realty and interests in Mann Realty's properties. (Id. at A360, A367-69, A401).

At the beginning of the hearing, the Trustee and Mann Realty informed Judge Opel that they had agreed to appoint a Chapter 11 trustee rather than seek conversion or dismissal. (Hr'g Tr. 6:6-15, 6:19-21). Three of the four creditors objected and favored conversion, and the fourth did not object to conversion. (Id. at 12:7–13:23, 13:25–19:17, 22:16-21). Mann Realty objected to conversion: "I'm not sure it makes sense to shut the debtor down and do a fire sale in Chapter 7, whereas a Chapter 11 trustee may be able to sell certain of the debtor's properties, pay off

3

the creditors, and have a viable business remaining." (Id. at 7:22-8:1). The Trustee also pointed out that some properties had significant equity, a sign that conversion may be inappropriate. (Id. at 8:4-7).

The hearing continued with an exploration of Mann Realty's ongoing activities. According to Mumma, only two properties were generating income, (id. at 24:9-17), and one of those properties was scheduled for a sheriff's sale in April 2017 to satisfy a debt owed to Santander Bank, (id. at 12:21-13:18, 22:22-23:1). Mann Realty, through Mumma, had otherwise consented to liquidating its properties, except the quarry. (Id. at 24:18-21, 28:15-22; see also Doc. 26-2 at A366).

Mann Realty valued the quarry at roughly $12 million. (Doc. 26-2 at A303, A407). Yet Mumma testified that it was not generating income and had not since 2015. (Hr'g Tr. 34:9-12). Instead, the valuation included a potential "contract … that would have generated $20,000 a month for parking trucks" on the quarry's property. (Id. at 31:17-32:7). Mumma did not identify the prospective party to the contract or present evidence of this contract. He also testified that he had the necessary permits to operate and mine the quarry through another company he owned, Rocky Licensing. (Id. at 26:9-12). Mumma did not physically have the permits at the hearing. (Id. at 35:9-18). The quarry was also partially flooded, (id. at 40:23-41:10), had a holdover tenant, (Doc. 26-2 at A358), and required roughly $200,000 of unidentified funds to become operational. (Hr'g Tr. 25:22-28:25).

Mumma testified that Pennsy Supply, the holdover tenant, owed roughly $1.5 million in rent, (id. at 33:15-21), that Mumma intended to pursue through litigation, (Doc. 26-2 at A362). As for the $200,000, Mumma testified that he would personally

4

provide the money, (Hr'g Tr. 29:1-7), despite the "multiple confessed judgments entered against [him] in excess of $5,000,000.00," (Doc. 26-2 at A363). As to Mann Realty's other assets, Mumma could not identify specific assets that made up a $5 million line-item for "buildings" in its financial reports, (Hr'g Tr. 37:8-38:8), or an $8 million line-item for "Mortgages/Real Estate Loans," (Id. at 38:9-24).

Mann Realty sought to offer testimony from two witnesses in opposition to the creditors' request to convert: Mumma and the real estate agent listing Mann Realty's property. (Id. at 49:13-21). Mann Realty and Mumma wanted the agent to testify about the "valuation and his efforts in regard[] to marketing the properties." (Id. at 49:13-21). Judge Opel did not permit this testimony because he did not view "valuation testimony as helpful at this stage." (Id. at 49:22-23). Each of the creditors agreed. (Id. at 49:23-52:2). Judge Opel explained that "we're at a narrow issue here," (Id. at 51:5), and confined his decision to "door one, appointment of a Chapter 11 trustee, or door two, conversion to Chapter 7." (Id. at 52:18-53:3).

## C.   Bankruptcy Court's Ruling

Judge Opel began with "cause" to convert, noting Mann Realty's consistent operating losses. Mann Realty's monthly operating reports showed net operating losses for several months before the conversion hearing. (Id. at 54:17-55:8). This alone cast doubt on the likelihood that Mann Realty could operate as a going concern: "[O]ne wonders … what good will or what going concern value there is for an entity that, best case, using the debtor's numbers, is showing an operating loss." (Id. at 55:2-5). Judge Opel also expressed concern and skepticism of Mann Realty's

amended operating report for November 2017, which showed decreased losses, but losses all the same. (Id. at 54:10-55:2).

Judge Opel also addressed Mann Realty's "gross mismanagement." Judge Opel found that Mann Realty incorrectly reported its finances and "either erroneously or purposely, has inflated its … equity and its balance sheet value by over $8.3 million. That is at least evidence of gross mismanagement …." (Id. at 55:18-23). That the company's president had "basically no information as to what mortgages are held by" the company troubled Judge Opel. (Id. at 55:15-18). This, in his view, is "not anything like candor to creditors or financial transparency." (Id. at 55:23-25). As more evidence of gross mismanagement, Mumma also made unauthorized payments to, and took unauthorized loans from, Mann Realty. (Id. at 56:13-57:2). Judge Opel also acknowledged that the company had been unable to confirm a Chapter 11 plan of reorganization. (Id. at 52:11-12).

Judge Opel then explained why conversion, and not appointment of a Chapter 11 trustee, was in the best interests of the creditors and the estate. (See id. at 57:3-12, 62:16-18). He found Mumma's testimony about the quarry's going-concern value lacked credibility: "Mumma had an opportunity to testify in an effort to convince the Court that appointment of the Chapter 11 trustee is in the best interest of creditors. His – in his testimony, he first said that the quarry is operational; then said there's no equipment there; and later admitted that it has received no income since September of 2015." (Id. at 58:16-21). Mumma did not produce evidence that an entity was permitted to operate the quarry, so Judge Opel discounted the suggestion that there is "some operational value or going concern

value to the quarry." (Id. at 59:5-13). The purported agreement with Rocky

Licensing was insufficient. (Id. at 59:14-60:3).

Judge Opel was also concerned that a Chapter 11 trustee "would lack the

funds to pay the most basic expenses" and operate Mann Realty as a going concern.

(Id. at 61:9-22). To Judge Opel, Mumma's assurance that he would personally

provide the $200,000 to revive the quarry was not persuasive. (Id.) On the other

hand, that there was some rental property favors Chapter 11. (Id. at 60:14-24). But

that property was spoken for; it was scheduled for a sheriff's sale and would be

liquidated even if a trustee were appointed. (Id. at 60:21-24).

Mumma's credibility was important to Judge Opel. Mumma testified that the

quarry could be mined, but the disclosure statements said that it could not. (Id. at

51:23-52:6). Judge Opel found that "those two statements … are irreconcilable. And

it suggests that Mr. Mumma has been purposely overly optimistic in his testimony,

or that the disclosure statement was false in suggesting that there is no operational

capacity." (Id. at 62:6-10). Judge Opel concluded with this observation:

> All of these -- this accumulation of inaccuracies or
> falsehoods, you choose the pronoun, tell me that it is time
> for a Chapter 7 trustee to be appointed to take control of
> these assets, try to figure out what is really owned, and
> what is truly owed by this corporation, and that
> management -- current management be ousted. I find
> that it would be in the best interest of creditors that the
> case be converted to Chapter 7 with the United States
> Trustee appointing a Chapter 7 trustee.

(Id. at 62:11-18).

## II. Legal Standard

The decision to convert a case under 11 U.S.C. § 1112(b) is reviewed for an abuse of discretion. _In re_ Am. Capital Equip., LLC, 688 F.3d 145, 161 (3d Cir. 2012). The bankruptcy court abuses its discretion when it "bases its opinion on a clearly erroneous finding of fact, an erroneous legal conclusion, or an improper application of law to fact." _In re_ Prosser, 777 F.3d 154, 161 (3d Cir. 2015) (quoting LaSalle Nat'l Bank v. First Conn. Holding Grp., LLC, 287 F.3d 279, 288 (3d Cir. 2002)). We review a bankruptcy court's findings of fact for clear error, see DCNC N.C. I, L.L.C. v. Wachovia Bank, N.A., Nos. 9-3775 & 9-3776, 2009 WL 3209728, at *1 (E.D. Pa. Oct. 5, 2009), and its evidentiary rulings for abuse of discretion, see Paige v. Lerner Master Fund, LLC, 584 B.R. 502, 513 (M.D. Pa. 2018) (citing _In re_ Hernandez, 860 F.3d 591, 601 (8th Cir. 2017)).

District courts have jurisdiction to hear appeals of a bankruptcy court's final order under 28 U.S.C. § 158(a)(1). Conversion from Chapter 11 to Chapter 7 is a final order. _In re_ Fleurantin, 420 F. App'x 194, 196 (3d Cir. 2011) (nonprecedential).

## III. Discussion

Mumma asks us to find the Bankruptcy Court's conversion to Chapter 7 and its prohibition on valuation testimony improper. The Trustee objects, arguing that Judge Opel identified several "causes" for conversion, that Mann Realty failed to

carry its statutory burden, and that Judge Opel property excluded valuation

testimony. We conclude that the Bankruptcy Court did not abuse its discretion.[2]

### A.    Statutory Framework

Conversion decisions are governed by the burden-shifting scheme in 11

U.S.C. § 1112. After "notice and a hearing," the bankruptcy court

> shall convert a case under this chapter to a case under
> Chapter 7 or dismiss a case under this chapter, whichever
> is in the best interests of creditors and the estate, for
> cause unless the court determines that the appointment
> under section 1104(a) of a trustee or an examiner is in the
> best interests of creditors and the estate.

Id. § 1112(b)(1). The court may not convert or dismiss the case if: (1) there are

"unusual circumstances establishing that converting or dismissing the case is not in

the best interests of creditors and the estate"; (2) "there is a reasonable likelihood

that a plan will be confirmed" within a "reasonable period of time"; (3) the grounds

for cause are not under Section 1112(b)(4)(A); and (4) the grounds for cause include

an act or omission for which there is a "reasonable justification" and that will be

"cured within a reasonable period of time." Id. § 1112(b)(2).

---

[2] Mumma also claims "the Bankruptcy Court abused his discretion in substituting his judgment over the administrative authority of the Office of the United States Trustee." (Doc. 23 at 14-15). This was wrong, says Mumma, because "the congressional intent was to grant the Office of the United States Trustee broad supervisory authority in bankruptcy cases." (Id. at 14). This argument is meritless. First, Section 1112(b) directs the "court" to convert or dismiss a bankruptcy case in the appropriate circumstance. Second, the decision to convert or dismiss is in the court's discretion. In re Am. Capital Equip., 688 F.3d at 161. And third, adopting Mumma's argument would effectively eliminate the bankruptcy court's role in Chapter 11 conversion cases, as well as jettison Sections 1112(b)-(e) from the United States Code. Suffice it to say that we find no merit in this argument.

Along with the statute, ordinary bankruptcy principles inform our analysis. Chapter 11 bankruptcy embraces the "two recognized policies [of] preserving going concerns and maximizing property available to satisfy creditors." 7 RICHARD LEVIN & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 1112.04(5)(a) (16th ed. 2019) (quoting Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 435 (1999)). When continuing a Chapter 11 case "promote[s] the twin goals of preserving viable businesses and maximizing the creditors' return, … the case is probably not a candidate for conversion …. On the other hand, Chapter 11 is not a panacea for every debtor in distress." Id. ¶ 1112.04(5)(a) (citations omitted). It is with these principles in mind that we review the Bankruptcy Court's decision.

**B.     Cause**

Mumma does not refute the Bankruptcy Court's finding of "cause." (See Doc. 23 at 12; Doc. 27 at 6). Additionally, the agreement between the Trustee and Mann Realty to appoint a Chapter 11 trustee establishes cause. See In re Camden Ordnance Mfg. Co. of Ark., Inc., 245 B.R. 794, 799 (E.D. Pa. 2000). Mumma instead argues that the Bankruptcy Court deprived him of the opportunity to present evidence that appointment of a Chapter 11 trustee, rather than conversion to Chapter 7, was in the best interests of the creditors and the estate. (Doc. 23 at 12-13). That said, because Mumma broadly argues that the Bankruptcy Court abused its discretion, we briefly explain why the court was right and Mumma is wrong.

Section 1112(b)(4) offers a nonexhaustive list of bases for finding "cause" to convert or dismiss. See 11 U.S.C. § 1112(b)(4); In re Am. Capital Equip., 688 F.3d at 161. Cause also exists when there is no "reasonable possibility of a successful

reorganization within a reasonable period of time." Id. at 162 (citing In re Brown, 951 F.2d 564, 572 (3d Cir. 1991)). The Bankruptcy Court needs only one basis for "cause," i.e., "one cause is enough." In re Alston, 756 F. App'x 160, 164 (3d Cir. 2019) (nonprecedential) (citing In re Hoover, 828 F.3d 5, 11 (1st Cir. 2016)).

Judge Opel correctly found cause to convert via "gross mismanagement." The record also contains sufficient evidence to conclude that Mann Realty suffered "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." We address these in turn.

### 1. *Gross Mismanagement*

The debtor becomes a "debtor in possession" upon entering Chapter 11 bankruptcy, 11 U.S.C. § 1101(a), and consequently owes its creditors a fiduciary duty. In re Gateway Access Sols., Inc., 374 B.R. 556, 565 (Bankr. M.D. Pa. 2007) (citing In re G–I Holdings, Inc., 385 F.3d 313, 319 (3d Cir. 2004)). A debtor violates this duty by, inter alia, inaccurately reporting income. See In re Alston, 756 F. App'x at 164. As several courts have said, monthly operating reports are the "life blood of Chapter 11, enabling creditors to keep tabs on the debtor's post-petition operations." In re Domiano, 442 B.R. 97, 105 (Bankr. M.D. Pa. 2010) (quoting In re Kholyavka, No. 08-10653, 2008 WL 3887653, at *4 (Bankr. E.D. Pa. 2008)).

The record is teeming with evidence of gross mismanagement. (See, e.g., Hr'g Tr. 53:11-57:2). For example, Judge Opel found that he could not trust Mann Realty's financial documents. (Id. at 55:9-56:12). Shortly before the hearing, Mann Realty amended its November 2017 monthly operating report, decreasing its net operating loss by over $125,000. (Id. at 54:10-22). This amendment, and the

"numbers that the debtor has reported," "strain[ed] the credulity of the Court." (Id. at 54:23-24). Mumma was also unable to account for over $8 million in assets, "either erroneously or purposely." (Id. at 55:15-21). We agree with Judge Opel that this was "at least evidence of gross mismanagement" and nothing like "candor to creditors or financial transparency." (Id. at 55:18-25). We also agree that Mumma's unauthorized payments to, and unauthorized loans from, Mann Realty constitute gross mismanagement. (Id. at 56:13-57:2); accord In re Gateway Access Sols., 374 B.R. at 566. At bottom, we do not think the Bankruptcy Court's finding of gross mismanagement was clearly erroneous.

### 2. *Substantial or Continuing Loss, Diminution of the Estate, and Rehabilitation*

The Trustee also argues that the Bankruptcy Court found cause in the substantial or continuing loss to or diminution of the bankruptcy estate, absent a reasonable likelihood of rehabilitation. (Doc. 26 at 18-20). To determine continuing losses or diminution of the estate, the court "looks to both the financial prospects of the Debtor and the financial records filed with the Court." In re Gateway Access Sols., 374 B.R. at 564. As with gross mismanagement and financial reporting, the debtor's monthly operating reports are a key metric. See id. Negative operating cash flows establish continuing loss or diminution of the estate. In re Alston, 756 F. App'x at 164 (citing Loop Corp. v. U.S. Tr, 379 F.3d 511, 515-16 (8th Cir. 2004)); In re Gateway Access Sols., 374 B.R. at 564 (collecting cases). So does the inability to pay current expenses. In re Gateway Access Sols., 374 B.R. at 564 (collecting cases). The record before the Bankruptcy Court established the debtor's continuing loss

12

and diminution of the estate.  Indeed, a review of the debtor's monthly operating reports over nine months showed consistent and substantial net operating losses. (See Doc. 26-1 at A97-222, Doc. 26-2 at 223-33).

As for the likelihood of rehabilitation, the record does not show that the debtor could revive its business.  "Rehabilitation" does not require that the debtor show that it will confirm its plan; it requires a showing that the debtor can "reestablish [the] business."  7 COLLIER ON BANKRUPTCY ¶ 1112.04(6)(a)(ii); see also In re Wen-Kev Mgmt., Inc., No. 14-2196, 2014 WL 7370050, at *4 (D.N.J. Dec. 29, 2014) (citing In re AdBrite Corp., 290 B.R. 209, 216 (Bankr. S.D.N.Y. 2003)).  In determining whether the business can be reestablished, we refer to many facts discussed in the continuing loss analysis.

The debtor's historically poor performance does not foretell a rosier future. Indeed, Mumma could not present compelling testimony or evidence that the debtor was valuable as a going concern.  The record reflects that Mann Realty struggles to generate cash flow to address "mortgage obligations and real estate taxes," (Doc. 26-2 at A257, A358), that only two properties were generating rental income, (Hr'g Tr. 24:9-17), that an income-generating property was scheduled to be sold, (id. at 12:21-13:18, 22:22-23:1), that the debtor lacked secure future contracts, (id. at 31:17-32:7), and that a large influx of cash was needed to operate the quarry, (id. at 25:22-28:25).  And Mumma could not show the future looks brighter.  (See id. at 58:16-62:10).  The record demonstrates that the debtor had no reasonable likelihood of rehabilitating itself in a reasonable time.

C.     **Unusual Circumstances & Best Interests**

After cause is established, the burden shifts to the opposing party to identify

unusual circumstances that suggest conversion would not be in the best interests of

the estate and its creditors, and that there is a reasonable likelihood that a

reorganization plan will be confirmed in a reasonable time.  11 U.S.C.

§ 1112(b)(2)(A).[3]  The debtor must also show that the grounds for finding "cause"

are justified and will be cured within a reasonable period.  Id. § 1112(b)(2)(B).

Mumma argues that he was deprived of his right to present testimony as to the

"best interests" of the creditors and the estate when the court disallowed valuation

testimony.  Based on the record before us, we find the Bankruptcy Court's ruling to

be neither an abuse of discretion nor clearly erroneous.

1.     *"Unusual circumstances," likelihood of confirmation,*
       *reasonable justification, & likelihood to be cured*

Unusual circumstances are those circumstances "not common in Chapter 11

cases that explain why a plan is reasonably likely to be confirmed within a

reasonable period of time."  In re Grasso, 497 B.R. 448, 455 (Bankr. E.D. Pa. 2013)

(citing In re Domiano, 442 B.R. at 107).  This inquiry is "result oriented."  In re

Korn, 523 B.R. 453, 468 (Bankr. E.D. Pa. 2014).  That is, "courts focus on the likely

---

[3] When cause is shown by "substantial or continuing loss to or diminution of
the estate" under 11 U.S.C. § 1112(b)(4)(A), conversion or dismissal is automatic—
the burden does not shift to the opposing party to show unusual circumstances.
See 11 U.S.C. § 1112(b)(2)(B).  Although we find enough evidence in the record of
cause under section 1112(b)(4)(A), Judge Opel's decision appears to have been
based primarily on a finding of gross mismanagement under section 1112(b)(4)(B).
(See Hr'g Tr. 52:4-57:12).  We will therefore address the "unusual circumstances"
prong.

consequences of remaining in Chapter 11 or converting the case to Chapter 7 and consider what the likely differences would be in the end result under each chapter." Id. Only when the likely outcome for creditors would be "vastly superior" under Chapter 11 do unusual circumstances exist. Id.

Mann Realty did not meet its burden. It missed its chance to present evidence about its "unusual circumstances" at the conversion hearing. There is also nothing "unusual" about corporate mismanagement or poor economic performance. Moreover, Mann Realty did not try to show that its performance difficulties would be cured within a reasonable time. Mann Realty's reorganization plan, which explained it would liquidate 11 of 12 properties, was an effective equivalent to Chapter 7 liquidation. (Doc. 26-2 at A366, 377). As for the remaining property—a quarry that was both literally and figuratively underwater—Judge Opel explained why he did not believe it could survive as a going concern. (See Hr'g Tr. 58:16-62:10). All that said, the outcome would not likely have been "vastly superior" under Chapter 11 supervision rather than Chapter 7 liquidation. (See id. at 8:8-20).

In addition, neither Mumma nor his counsel offered to present evidence that the debtor could promptly confirm a reorganization plan. Mumma now argues that "[t]he Court did not want to hear testimony about the Debtor's ability to reorganize," evidenced by its refusal to hear valuation testimony. (Doc. 23 at 16). It is unclear how the valuation of properties the debtor intends to liquidate relates to the ability for a Chapter 11 trustee to reorganize or manage the debtor's assets. Mumma does not explain why valuation testimony would improve the odds that its surviving assets would suddenly thrive as going concerns. Simply claiming that this

testimony would have "established the abundance of equity" and the "viability of an on-going concern" is not enough. (Id.)

In any event, the Bankruptcy Court had mountains of evidence (discussed earlier) suggesting that Mann Realty could not confirm a plan within a reasonable time. The court need not "clog its docket with visionary or impracticable schemes for resuscitation." *In re* Brown, 951 F.2d at 572 (quoting Tenn. Publ'g Co. v. Am. Nat'l Bank, 299 U.S. 18, 22 (1936)). While "visionary or impracticable" is a low bar, the debtor must do more than "manifest unsubstantiated hopes for a successful reorganization." *In re* Brown, 951 F.2d at 572 (citation omitted).

To the extent that we are asked to rely on Mann Realty's plan to lease the quarry, (Doc. 26-2 at A257, A260, A358, A362), we accept that plan for what it is: an "optimistic hypothetical projection[] of undocumented future deals and unnamed future customers." *In re* Gateway Access Sols., 374 B.R. at 563. Without concrete evidence of such an arrangement, or evidence that the quarry is restored to its pre-flood state, this plan is merely aspirational. Admirable though this optimism may be, it cannot carry the day in the bankruptcy court. We conclude that Judge Opel's decision was not an abuse of discretion.

### 2. *"Best interests of the creditors and the estate"*

Mumma argues that the Bankruptcy Court abused its discretion in preventing him from offering valuation and marketing testimony. This evidence, says the debtor, was relevant to deciding whether a Chapter 11 trustee or conversion to Chapter 7 would better serve the interests of the creditors and the estate. (Doc. 23 at 12-13). As the argument goes, valuation testimony would have

16

spoken to "the viability of an ongoing Chapter 11, even one where the majority of the assets were to be liquidated." (Id. at 13). And it also would have "established the abundance of equity" and the "viability of an on-going concern." (Id. at 16).

But Mumma fails to explain *how* valuation testimony would establish the "viability" of the Chapter 11 entity, *how* that evidence would negate the overwhelming evidence that Mann Realty could not survive as a going concern, or *how* valuation testimony would show that conversion was not in the best interests of the creditors and the estate. Conclusory arguments of the *ipse dixit* variety will not override a bankruptcy court's discretion. We also agree with the Trustee that the debtor's efforts to market and value the properties are irrelevant to the Chapter 11 trustee's ability to oversee the debtor in Chapter 11. (See Doc. 26 at 27-28). We therefore disagree that the Bankruptcy Court abused its discretion.

Two principles dictate our conclusion. First, we reiterate that continuing Chapter 11 bankruptcy is appropriate when it furthers the "twin goals of preserving viable businesses and maximizing the creditors' return." 7 COLLIER ON BANKRUPTCY ¶ 1112.04(5)(a) (citations omitted). Second, creditors are the "best judge of their own interests." *In re* Camden Ordnance Mfg. Co., 245 B.R. at 802.

Mann Realty tried to show how the quarry has going-concern value. It could not make that showing. Rather, it planned to liquidate 11 of its 12 properties and remain in possession of a quarry with substantial impediments to generating

income.  (Doc. 26-2 at A366).  Judge Opel articulated several reasons why

conversion was preferable to a Chapter 11 trustee:

- The record was replete with evidence of gross mismanagement by Mann Realty's management team.  (Hr'g Tr. 53:11-57:4).

- Mann Realty's monthly operating reports showed substantial net operating losses.  (Id. at 54:10-55:8).

- Mann Realty inaccurately reported its income and inflated the value of its assets.  (Id. at 55:9-56:12).

- Mumma took loans from and made improper payments to Mann Realty in violation of the Bankruptcy Code.  (Id. at 56:13-20).

- Mumma's testimony lacked credibility and cast doubt on the capacity for resuscitation of Mann Realty's most valuable property, the quarry.  (Id. at 58:16-59:13).

- Mumma could not support his testimony with evidence showing there was an enforceable contract (or the accompanying permits) to operate the quarry.  (Id. at 58:24-60:3).

- Income-generating property identified by the parties was scheduled for liquidation, preventing the court from finding "in favor of a Chapter 11 trustee versus a Chapter 7 trustee."  (Id. at 60:14-24).

- It is unclear that a Chapter 11 trustee would have funds to continue operations or pay Mann Realty's most basic expenses given the entities' operating losses.  (Id. at 61:9-18).

With this evidence in mind, Judge Opel "discount[ed] the suggestion … that

there is some operational value or going concern value to the quarry" that would

justify a Chapter 11 trustee.  (Id. at 59:8-10).  To Judge Opel, this "diminishes Mr.

Mumma's credibility ….  And, again, that suggests that the quarry probably should

be looked at for its liquidation value rather than some going concern value."  (Id. at

60:8-13).  The debtor's reorganization plan and disclosure statements—which

include information we assume to be accurate—reinforce Judge Opel's decision.

Both documents included the purported value of the debtor's assets.  (See Doc. 26-2 at A362, A403-09).  Both documents also explained the impediments to reviving the quarry's business.  (See id. at A257, A358, A362).

Against this record evidence, we cannot credit the debtor's unsubstantiated assertion that conversion would be less beneficial to the estate and the creditors—who overwhelmingly supported conversion and opposed valuation testimony—than maintaining in Chapter 11.  In re Domiano, 442 B.R. at 107.  We find that the Bankruptcy Court's decision to prohibit valuation testimony, and its conclusion that Chapter 7 better served the interests of the creditors and the estate, was not an abuse of discretion.

## IV.    Conclusion

We will dismiss this appeal (Doc. 1) from the Bankruptcy Court's decision. An appropriate order shall issue.


                                    /S/ CHRISTOPHER C. CONNER
                                    Christopher C. Conner, Chief Judge
                                    United States District Court
                                    Middle District of Pennsylvania


Dated:    September 30, 2019